RICHARD A. SCHELL and PHYLLIS F. SCHELL v. CITY OF JEFFERSON, MISSOURI, a Municipal Corporation, Appellant.—No. 40223.—212 S. W. (2d) 430.

Court en Banc, May 27, 1948.

Rehearing Denied, June 14, 1948.

*Paul Ewing Allen* and *D. F. Calfee* for appellant.

1022

*Lewis Hord Cook, H. P. Lauf* and *John O. Bond* for respondents.

[431] BOHLING, C.—Proceeding to quiet title, instituted by Richard A. Schell and Phyllis F. Schell against the City of Jefferson, Missouri, a municipal corporation, the land being described as follows:

"Parts of Inlots Nos. 295 and 296 in the City of Jefferson, Missouri.

"Beginning at a point on the easterly line of Inlot No. 296 and 90 feet southerly from the northeasterly corner of said Inlot on Walnut Street, thence southerly, along said easterly line, 108 feet and 9 inches to High Street, thence westerly, along said High Street, 208 feet and 9 inches to the southwesterly corner of Inlot No. 295, thence northerly, along the westerly line of said Inlot No. 295, 108 feet and 9 inches, thence easterly, parallel with High Street, 208 feet and 9 inches to the point of beginning."

The City's answer alleged that inlots Nos. 295 and 296 are fractional inlots in said City, lying north of and adjacent to a strip of ground on the north side of Weir's (Ware's) creek; and that the land north of said creek and south of the boundaries of said inlots Nos. 295 and 296, including the creek, as shown on the plat of said City, is the property of the City in fee simple.

Plaintiffs' metes and bounds description shows inlot 296 east of inlot 295 and extends the east line of inlot 296 south along the west line of Walnut street to High street, the north line of High street being 12 feet and 3 inches north of the south bank and in the bed of Weir's creek. The controversy involves the south line of said inlots; i. e., whether it is as described in plaintiffs' petition or as shown on the plat of the City.

The court denied the City's plea and, on the theory the City was a stranger to the title and plaintiffs made a prima facie case by showing possession (Hunter v. Weil (Mo.), 222 S. W. 472, 475 (III); 51 C. J. 257, sec. 235; 44 Am. Jur. 37, sec. 44), adjudged the title to the land described by metes and bounds in plaintiffs. The [432] City appealed. The trial was to the court and our review is de novo on the whole record "as in suits of an equitable nature." Laws 1943, p. 387, sec. 114.

The Congress of the United States provided in the act authorizing Missouri to become a state: "That four entire sections of land be, and the same are hereby, granted to the said State, for the purpose of fixing their seat of government thereon . . . ," the selection to be in accord with the direction of the legislature of the State.[1] The

---

[1] 3 U. S. Stat. 547, sec. 6, "Fourth," Enabling Act, March 6, 1820; R. S. 1845, p. 21; 1 Mo. R. S. 1939, p. 56c; 28 Mo. R. S. A. 218,

conditions of this act of Congress were accepted and Missouri was thereafter admitted to statehood.[2]

The Missouri constitution of 1820, Art. XI, directed the first General Assembly of Missouri to appoint Commissioners to select the aforesaid four sections of land, and to "lay out a town thereon under the direction of the General Assembly."[3] The General Assembly, conforming to said mandate, appointed Commissioners to select a suitable location for the permanent seat of government of the State and the aforesaid four sections of land.[4] Proceedings followed resulting in the selection by the Commissioners and the acceptance by the General Assembly of the four sections of land and the location of the permanent seat of government of the State thereon.[5] An act of January 11, 1822, provided that, under the direction of the Commissioners aforesaid, a town, to "be called 'City of Jefferson,'" be laid out by a surveyor, appointed by the Governor, on the four sections aforesaid, the said town to contain "at least one thousand lots" in dimensions to be determined by the Commissioners, with a principal street between 100 to 120 feet and other streets of not less than 80 feet in width, with alleys 20 feet wide, and that the remainder of said sections be laid out "into lots of five, ten, twenty and forty acres," et cetera; said Commissioners to report to the next General Assembly.[6] The Commissioners made their report to the General Assembly, "accompanied by a plat of the City of Jefferson."[7] By joint resolutions the General Assembly directed that said report, with other documents on the subject, be deposited in the office of the Secretary of State for safekeeping;[8] and also, on December 19, 1822, directed the Secretary of State "to cause the plan of the City of Jefferson to be made out on parchment, and deposited in his office, . . . and also to furnish the trustees of the City of Jefferson, as soon as may be, with a copy of the plan of said City . . . ."[9]

An act of December 19, 1822, appointed named persons "Trustees of the said City of Jefferson" and authorized them to offer for sale to the highest bidder 200 lots in said City, and vested them with other,

[2]Ordinance of Acceptance, July 19, 1820; R. S. 1845, p. 22; 1 Mo. R. S. 1939, p. 57c; 28 R. S. A. 220. See 3 U. S. Stat. 645; 28 Mo. R. S. A. 223; 1 Mo. Terr. Laws 758; 28 Mo. R. S. A. 224; 3 U. S. Stat. 827 (Appendix II); 28 Mo. R. S. A. 226.

[3]R. S. 1845, p. 42; 28 Mo. R. S. A. 243.

[4]1 Terr. Laws 649, 773; Acts approved November 16, 1820, and June 28, 1821.

[5]1 Terr. Laws 825; approved December 31, 1821. See also 1 Terr. Laws 780.

[6]1 Terr. Laws 859.

[7]House Journal, 2d General Assembly, Monday, November 18, 1822, p. 62; Senate Journal, Id., December 18, 1822, p. 130.

[8]1 Terr. Laws 984.

[9]1 Terr. Laws 985.

powers and duties.[10] An act of February 12, 1839, incorporated the City of Jefferson and authorized the City authorities "to open and keep in repair streets, avenues, lanes, alleys, drains and sewers, and keep the same clean" et cetera; and vested "all property, real and personal, heretofore belonging to the inhabitants of the City of Jefferson, or the trustees thereof in their corporate capacity . . . in the corporation . . ."[11] An act of March 27, 1872, codified the several acts respecting [433] the City of Jefferson and was to like effect as the act of February 12, 1839.[12]

Plaintiffs introduced two deeds from Commissioners of the Permanent Seat of Government. One, recorded August 26, 1844, conveyed "inlot 295"; the other, recorded August 8, 1840, conveyed "inlot 296." Each conveyance recited it was made "under the act of General Assembly approved February 6, 1837." Said act required said Commissioner to protect "the streets, alleys, avenues, public schools and commons within the limits of the" City of Jefferson. It authorized said Commissioner to sell certain inlots and outlots to be selected indiscriminately in said City, to issue certificates to the purchasers "describing the number of the lot, if an inlot;" and if an outlot, its number and number of acres therein; and, upon payment, a deed conveying the fee simple title. Laws 1836-7, p. 31, secs. 4, 8, 16, 17.

The inlots continued to be conveyed by number only until December, 1898, when the Jefferson City Building and Loan Association executed a quitclaim deed releasing a deed of trust against the lots and added to the numbers of the inlots the metes and bounds description appearing in plaintiffs' petition. All subsequent conveyances have included this metes and bounds description.

Plaintiffs next offered portions of the files in a suit instituted in 1928 by the City of Jefferson against John and Etta Riner, the general object and purpose of which was to restrain said defendants as owners of real estate, described the same as in plaintiffs' petition herein, from erecting a concrete wall thereon affecting the flow of the water in Weir's creek. There was no judgment on the merits in the case. It was disposed of by stipulation wherein the City agreed to pay the defendants and their attorney $250 and a record entry showing the filing of said stipulation. These proceedings were admitted on the theory the original deeds in describing the inlots by number only were ambiguous and the description given by the City in the injunction suit might aid in a proper construction of said deeds. They were not admitted upon the theory and we understand it is not contended

---

[10] 1 Terr. Laws 1018. Among other acts respecting lots in said City see 2 Terr. Laws 24, 193 and 440, the first mentioned authorized the payment of $10 for drawing and painting a plat of said City.

[11] Laws 1838-9, pp. 306-311, secs. 12, 13, 14, 19.

[12] Laws 1871-2, pp. 389-396, see secs. 9, 33.

that the City Counselor might bind the City by allegations in a pleading to the extent of surrendering the rights of the public in and discharging the City's obligations with respect to real property if such allegations be contrary to the facts.

Plaintiffs also introduced deeds (three) in their chain of title from the Riners, plaintiffs acquiring their title in November, 1944. Mr. Schell testified plaintiffs had constructed improvements worth $40,000 on the inlots and that (disputed by the City) they have claimed ownership and possession of all the land since they received their deed.

F. E. Ross, county engineer and surveyor of Cole county, Missouri, testified that he made a survey of the land involved from the Schell deed and that his plat, exhibit 12, reflected accurately the boundary lines, as described in said deed. Witness testified he used for a starting point a bolt "I think it is in the concrete wall at the corner of Kline's building on Main street and Walnut, it has been there for several years, and the mark on the curb on the south side of High street for the west line of Walnut" to run the line on Walnut street. He gave the dimensions of the "ordinary" inlots around the main part of the City as 198 feet 9 inches by 104 feet 4½ inches. Asked: ". . . you made that survey [referring to exhibit 12] from what?

"The Witness: Mr. Schell's deed.

"Q. You didn't go to any City plat or any plat of any kind?

"A. I did not."

We have said in a number of cases: "Evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes, is of no probative force." Landers v. Thompson (#40,209, 11,10-47), 356 Mo. 1169, 205 S. W. 2d 544 citing cases; Diers v. Peterson, 290 Mo. 249, 258, 234 S. W. 792, 794[4]; Klinhart v. Mueller (Mo.), 166 S. W. 2d 519, 523[1]. See also: "A surveyor who attempts by parol evidence to establish a survey would have to show the same facts by parol that would have to be shown on [434] the plat." Pioneer Cooperage Co. v. Bland, 228 Mo. App. 994, 1001, 75 S. W. 2d 431, 435[4].

The Ross survey starts and ends with the metes and bounds description in the Schell deed. Its correctness in this respect is not contested; but, under the authorities mentioned, it is not sufficiently definite to have probative value respecting the issue for determination between the litigants.

We think the court erred in excluding the City's exhibit D, an ancient copy of a plat of the City of Jefferson, as under the instant record there is no method of legally ascertaining the location or the boundaries of inlots 295 and 296 (or other inlots of the City) unless recourse be had to exhibit D or some plat based thereon. This is essential to truly establish the lines, courses and distances from some point officially set by a United States Government survey. No one

knew who set the "bolt" in the corner of Kline's building or the "mark" on the High street curb used by Ross, or how said points were established. The original official plat of the City accompanied the report to the General Assembly of the Commissioners appointed to lay off the inlots of the City. The Secretary of State was required to have said plat of the City made out on parchment, to deposit it in his office and to furnish a copy to the trustees of said City. (Notes 7, 8, 9, supra.) These plats were the result of specific official acts of the General Assembly and would be competent evidence. The City established that none of said plats was now in existence in the office of the Secretary of State or in the office of the City Clerk of said City, and also that no official plat of said City was in the office of the Recorder of Deeds of Cole county, Missouri. Evidence, however, was adduced establishing that said exhibit D had been hanging on the walls of said Recorder's office, being framed and under glass, continuously for approximately twenty years according to the present Recorder of Deeds, and for at least twenty-six years according to another witness. Other evidence warranted the direct inference that it had been in use for forty years or more. It bears the date "1849." It shows McCarty street in said City as Van Buren. There was testimony that it had been drawn on paper and mounted on cloth and now is yellow with age; "a very old document." One witness was of opinion it was of the date shown on its face: 1849. The name of Van Buren street in the City of Jefferson was changed to McCarty street by an act of the General Assembly in 1857. Laws 1856-7, p. 306. Said plat had never been inventoried as an official document or recorded by any recorder. There are no measurements on it. However, it was shown to be drawn to scale and to be an accurate plat of the City as it now exists and has existed. It has been used by officials, surveyors, abstractors, and others interested in the title to real estate within the City. Subdivisions and additions to the City conform to this exhibit D. It is the oldest known plat of the City of Jefferson and is the basis for subsequent plats of property within the City. The record, discussions of counsel and some evidence on the fact, establishes that Capitol buildings of the State and the courthouse of Cole county, Missouri, had been destroyed at times by fire. We have hereinbefore set forth the acts of the General Assembly judicially establishing the existence of an original plat of the City of Jefferson. Many years have elapsed since the making of the original and the official copies. They are not now available, having been lost or destroyed. Plaintiffs' title has its origin in the deeds describing the lots according to said plats. In these circumstances, especially with plaintiffs' as well as defendant's rights ultimately founded upon the plat of the City of Jefferson, exhibit D was admissible as secondary evidence. Studebaker Mfg. Co. v. Dickson, 70 Mo. 272; Finney v. St. Charles College, 13 Mo. 266, 271; 32 C. J. S. 771, sec. 842, also

p. 755, sec. 827. A somewhat similar situation existed in Westbrook v. City of Jackson, 165 Miss. 660, 145 So. 86, with respect to the "Smith map" therein mentioned and considered competent. See Hedrick v. Hughes, 82 U. S. (15 Wall.) 123, 21 L. Ed. 52; Brown v. Weare, 348 Mo. 135, 141[3], 152 S. W. 2d 649, 653[6] and cases cited; Sharp v. Richardson, 353 Mo. 138, 182 S. W. 2d 151. Plaintiffs refer on this issue to [435] authorities which broadly state that "the law relating to the admission in evidence of ancient documents has no application to" an instrument which does not purport to be the original. 3 Jones, Evidence, 2d Ed., 2062, secs. 1118-1122; Bell v. George, 275 Mo. 17, 34(VII), 204 S. W. 516, 520[6], citing McCleery v. Lewis, 104 Me. 33, 70 Atl. 540, 19 L. R. A. (N. S.) 438. Bell v. George and the Missouri cases there cited are also sufficiently distinguished from the instant case in that in each there was no showing, as here, that the original or other competent copy of the document had been lost or destroyed and was unavailable, a condition to the admissibility of any copy as a substitute for the original as the best evidence. 7 Wigmore, Evidence, 3rd Ed., 594, sec. 2143. See observations by the author of Bell v. George in Laclede L. & Imp. Co. v. Goodno (Mo.), 181 S. W. 410, 413[6-8]. McCleery v. Lewis is criticised by Wigmore, Id., p. 598.

Plaintiffs say even with the plat in evidence they are entitled to prevail because it shows the south boundary of said inlots to be the north bank of Weir's creek and therefore their title extends to the "thread" of the creek, the grant from the State containing no reservation. Whiteside v. Oasis Club (Mo.), 187 S. W. 27, 30[3]; Wright Lumber Co. v. Ripley County, 270 Mo. 121, 128(I), 192 S. W. 996, 998[1]. The trial court considered inlots 295 and 296 separate and apart from the rest of the plat and taking the plat as in evidence reached a like conclusion. We find no fault in the holdings of the cited cases or others reaching a like result on similar facts. There is no call in plaintiffs' deed of the water course constituting the boundary as in Whiteside v. Oasis Club. We understand the usual situation involving meander lines along a nonnavigable river existed in Wright Lumber Co. v. Ripley County, the court stating: "Where it [the United States] sells and conveys such lands by the government subdivisions, its patents convey all the land between the meander line on the shore and the middle thread of the river, unless previous to the issuance of the patent it has surveyed such lands as governmental subdivisions, or has expressly reserved them when not surveyed."

The dimensions of the inlots in the City of Jefferson were determined by the Commissioners appointed in 1822 but the dimensions of the outlets, the streets, and alleys were determined by the General Assembly. (Notes 6, 7.) The plat of these inlots and outlots was accepted by the General Assembly. (Notes 8, 9.) This plat estab-

lished the boundaries of the inlots, the streets, alleys, and other public places within said City. The acts of the General Assembly with respect thereto when followed by the sale of the inlots by number with reference to the plat constituted an effective dedication of the public places thereon to the use of the public. Byam v. Kansas City Pub. Serv. Co., 328 Mo. 813, 821, 41 S. W. 2d 945, 949, citing cases; Sharp v. Richardson, 353 Mo. 138, 182 S. W. 2d 151; Riverside v. Maclean, 210 Ill. 308, 71 N. E. 408, 66 L. R. A. 288, 293, 102 Am. St. Rep. 164; Consult Annotation, 8 L. Ed. 453. Upon the incorporation of the City of Jefferson, the City became the trustee of the dedicated property for the benefit of the public. The intention of the parties is a controlling factor in construing dedications to public use. Plats ''must be construed fairly and reasonably . . . ; they are to be construed as a whole in order that the intention of the party may be ascertained . . . ; no part of the plats is to be rejected as meaningless, if it can be avoided, and lines as well as words are to be considered; and all doubts as to the meaning of the plat and any conflict on its face will be construed most strongly against the dedicator. The court is not authorized to add a line to the plat which was not placed there when the original survey was made . . . '' 26 C. J. S., p. 132, sec. 49, *Plats*; 16 Am. Jur. 369, sec. 24; Byam v. Kansas City, supra.

█ Considering exhibit D as a whole it is our opinion that the lines thereon constitute the boundaries of the various inlots bordering on Weir's creek to the same extent as the lines thereon define the boundaries along the streets and alleys. All inlots on said plat are not uniformly 198 feet 9 inches by 104 feet 4½ inches, the usual size of inlots in the City. None bordering on Weir's creek is rectangular in shape. Some are triangular and platted [436] in such manner as to cut off other inlots on Weir's creek if their lines be extended corresponding to a metes and bounds description as in plaintiffs' deed; and at least one, if likewise extended, would encroach upon a public street of the City. Weir's creek, including its width, is indicated by definite lines on the plat and an excess of land exists between lines defining the creek proper and the lines of the inlots on each side of the creek. Two smaller streams empty into Weir's creek within the territory on which the inlots are platted and in every instance the platted lot lines form uniform rectangles and extend across the lines marking the course of said streams. Such lots include the banks and the beds of these streams; whereas throughout the course of Weir's creek on said plat the lines of inlots bordering thereon do not in any instance extend to or across said creek. Laws of 1837, p. 31, under which plaintiffs' title originated, limited the authority of the Commissioner of the Permanent Seat of Government to the conveyance of inlots by number, i. e., according to the plat of the City. '' 'Where a recorded plat shows the existence of a street or alley and land is con-

veyed by reference to such plat, a street or alley is necessarily excluded from the deed. The grantee is charged with notice of the streets and alleys shown by the map.' " Ackerman v. Ryder, 308 Mo. 9, 30(II), 271 S. W. 743, 749[7]. We conclude that the lines on the plat marked the boundaries of the inlots in 1822 and as title thereto passed out of the State, and that these boundaries may not be extended by adding descriptions corresponding with dimensions established generally for inlots in the City.

The judgment is reversed and the cause remanded with directions to adjudge the better title to the disputed area in the City in accord herewith.

PER CURIAM:—The foregoing opinion by BOHLING, C., in Division No. 2, is adopted as the opinion of the Court en Banc. *Tipton, Clark, Douglas, Hyde, JJ.,* and *Leedy, C. J.,* concur; *Ellison, J.,* concurs except as to remand with directions, he believing it should be a general remand; *Conkling, J.,* dissents.

## LIMITED CONCURRING OPINION.

ELLISON, J.—■ My vote concurring in the reversal and remanding of this cause *generally,* and *without* directions to enter judgment for the appellant city, is based on the following reasons. In Division 2 the present majority opinion of the court en banc was adopted by all the judges thereof. But respondents' counsel filed a motion for rehearing verified by the affidavit of counsel [as in the case of motions for new trial in the trial courts alleging newly discovered evidence] stating that the so-called "ancient document" plat shows each square block as a square inch, representing 400 feet, and each inlot as of a width of ¼ inch, making it 100 feet wide, whereas the records definitely show each square block is 417.5 feet wide, and each inlot 104 feet, 4.5 inches wide. In other words, as to the square blocks there is an error of 17.5 feet, and as to the inlots one of 4.5 feet. The affidavit further alleges these errors apparently are compensated for by showing the streets wider than they really are.

North and south, the plat covers all the territory between the Missouri River and Atchison Street; and east and west nearest to the River it extends from Clark Street to a point over six blocks west of the mouth of Ware Creek, and thence angles northeasterly, or easterly, back to Atchison Street. The plat includes all the main business district of Jefferson City and the South Side, and a substantial part of the residential section. The principal opinion shows that up to 1898, fifty years ago, inlots and outlots were conveyed by number, but after that by metes and bounds—indicating some uncertainty as to the former descriptions.

I find nothing in the opinion showing that conveyances within the area covered by the plat, and according thereto, have been found

correct through the years. Its origin is [437] obscure. Nevertheless the principal opinion admits it in evidence although the trial court rejected it. The statute of limitations does not run against the City. And if the plat is incorrect the consequences may be serious as to much valuable real estate. Because of these facts Division 2 transferred the cause to the court en banc on the court's own motion in order that it might be reargued. I am unable to see that it has been cleared up. While unable to say on the record that the judgment of the trial court should be affirmed, neither do I think it should be reversed outright. In my opinion the cause should be reversed and remanded for another trial, at which these questions may be settled.

CONKLING, J. (dissenting)— ██ I respectfully dissent from the holding of the principal opinion written by Commissioner Bohling and adopted as the opinion of the Court en Banc. If I correctly read the principal opinion, it holds that Judge Blair erred in excluding the purported map or plat (City's Exhibit D), and, upon the basis of that exhibit, decree title to the small parcel of land in question here to be in the defendant City

From a study of the transcript and an examination of the exhibits it is my conclusion that even if Exhibit D be considered as admitted in evidence the City's contentions are without record support.

I agree with the views of the trial judge as expressed in his memorandum opinion filed in the cause and incorporated in the transcript that Exhibit D was properly excluded, and that, if it were considered as admissible and received in evidence, it would not support the City's case.

While Exhibit D purports upon its face to have been drawn by one Erich Stump, and bears the figures 1849, and while it has hung on the wall in the office of the Recorder of Deeds in Cole County for twenty-six years, there is no evidence in the record here that it was made in the year 1849 and no evidence that it is any copy of any 1849 document.

Inlots 295 and 296 were originally conveyed as such Inlots, not fractional Inlots, by the State of Missouri in 1844 and 1840.

There is no evidence of identity of Erich Stump, nor any showing that he was an official or unofficial person. There was no proof under what authority, if any, Exhibit D was made, and no testimony whatever as to its origin. Other than as above indicated there was nothing to establish when it came into the Recorder's Office, who made it, who brought it there, why it was brought there, why it was on the wall, who ordered it to be placed there or why it had never been officially inventoried or recorded in that office as an official document. No figures or scale of measurement appear on the plat to indicate the length or width of any block, Inlot, Outlot, street, or alley. In fact,

the Missouri River is shown at the bottom of the plat, when in fact it is north of Jefferson City.

While counsel for the City, in colloquy, asserted their belief in the one-time existence of an original of Exhibit D, a search of the record filed here reveals no proof whatever that any original ever existed. There is no proof that Exhibit D was even a copy of any claimed original, and no proof as to what any claimed original may have tended to establish. It is my view that to rule that Judge Blair erroneously excluded and refused to consider Exhibit D, we are compelled to presume, and without any proof, that merely because the Legislature in 1822 directed such a plat or map to be made, that an original plat or map was in fact made. And from the mere historical facts that upon separate occasions the State Capitol building and the Cole County Court House were many years ago destroyed by fire, I do not think we can presume that there was an original plat in one of those buildings, and that it was destroyed by fire, or that all official records were thus destroyed. The testimony of an official in the office of the Secretary of State and of the Recorder of Deeds that after a search each had failed to find any original map in their respective offices, in my opinion fails to establish that, if an original plat ever existed, it does not now exist somewhere, and that further search may not reveal it. There is no proof as to what any original map might show, if any such ever was in existence. Under this state of the record, I see no ground for the admission of any secondary evidence.

[438] It is asserted in the City's brief that Exhibit D is an ancient document, and, in the alternative, that it is admissible as secondary evidence, it being, it is asserted, a copy of an original lost or destroyed document. Under the ancient document rule certain ancient instruments are held to be admissible under certain circumstances. But that rule applies only to the original ancient document. Exhibit D is not established to be an original at all. The ancient document rule does not apply to any document, however ancient, for which it is claimed only it is but a *copy* of an ancient document. Jones Commentaries on Evidence (2nd Ed.), Vol. 3, Sections 1118, et seq.; Bell v. George, 274 Mo. 17, 204 S. W. 516; Laclede Land and Imp. Co. v. Goodno (Mo. Sup.), 181 S. W. 410; McCleery v. Lewis, 104 Me. 33, 19 L. R. A. (N. S.) 438; Patterson v. Collier, 75 Ga. 419, 427; Jones v. Morgan, 13 Ga. 515; Ball v. Loughridge (Ky.), 100 S. W. 275; Schunior v. Russell (Tex.), 18 S. W. 404; 32 C. J. S., sec. 746, page 664. I do not think Exhibit D was admissible under the ancient document rule. It is merely contended, but it is not proved, that Exhibit D is a copy.

After study of this record I find that I am unable to agree with the holding of the principal opinion that inasmuch as the Secretary of State was required to have a plat made and deposited in his office that any original plat was actually ever made; or that such original

plat, if one ever existed, has been lost or destroyed; or that there exists here any record foundation upon which to admit Exhibit D as secondary evidence. The principal opinion seems merely to assume both the existence and the destruction of an original. I do not believe the courts can indulge any such presumptions. It is my opinion that the facts and that the inferences which the record compels forbid it.

The principal opinion seeks to distinguish our Bell v. George case by stating that in that case "there was no showing, *as here*, that the original or other competent copy of the document had been lost or destroyed and was unavailable", etc. I am unable to find in this record anything upon which I can presume any original ever existed, or was ever thereafter lost or destroyed.

In any event, neither Exhibit D, nor any instrument of title I have found in the record, expressly reserves to any one any title to any real estate between the southern boundary of Inlots 295 and 296, as those boundary lines appear on Exhibit D, and the thread or center of Weir's Creek, which is only an inland creek, non-tidal and non-navigable. It is my opinion, therefore, as I read the law, that plaintiff's Inlots 295 and 296 extend under the law beyond the line shown on Exhibit D to the center or thread of Weir's Creek and necessarily include therein the land in controversy here. Brown v. Wilson, 348 Mo. 658, 155 S. W. (2d) 176; Wright Lumber Co. v. Ripley County, 270 Mo. 121, 192 S. W. 996; Whiteside v. Oasis Club (Mo. Sup.), 187 S. W. 27; Felder v. Bennett, 2 McMull (S. C.) 44; Gould on Waters (3rd Ed.) 196; Angell on Water Courses, Par. 11,

For these reasons it is my opinion that Judge Blair decided the case correctly. I would affirm his judgment.

### ON MOTION FOR REHEARING.

It is further considered and adjudged by the Court that the said cause be remanded to the said Circuit Court of Cole County for a new trial; and that the said appellant recover against the said respondents its costs and charges herein expended, and have execution therefor.